### In re MASTER MORTGAGE INVESTMENT FUND, INC., a Delaware Corporation, Debtor.

**Bankruptcy No. 92–41306–2–11.**

United States Bankruptcy Court, W.D. Missouri, Western Division.

Feb. 28, 1994.

---

Ronald S. Weiss, for Equity Sec. Holders Committee.

Judith Strong, Asst. U.S. Atty., local counsel for Robert Reich, Secretary of Labor.

John McClelland, John P. Kreis, for debtor.

Bruce E. Strauss, for Payne & Jones Chartered.

Douglas J. Schmidt, for Inter–American.

Daniel J. Flanigan, for Metro North State Bank.

Joe B. Whisler, for Secured Note 1.

Dennis Dow, for Skopbank.

Frank Wendt, for F.D.I.C.

*MEMORANDUM OPINION*

FRANK W. KOGER, Chief Judge.

Debtor Master Mortgage Investment Fund (Master Mortgage) filed its Fourth Amended Plan of Reorganization on November 18, 1993 (the Plan). The Plan was duly transmitted to the creditors and all parties in interest of record together with a copy of the

Disclosure Statement previously approved by the Court. The Court considered the Plan and six objections to confirmation at a December 20, 1993 hearing.[1] Appearances of all counsel were duly noted. At the hearing, the Court heard evidence from witnesses, statements of counsel and legal arguments. Master Mortgage resolved five of the six objections which were withdrawn by the parties subject to oral modification of the plan. The Securities Exchange Commission's (SEC's) objection was taken under advisement. Additionally, the Court allowed Secured Note 1 Fund (Secured Note) fourteen days in which to file a written objection to the Plan based on evidence presented at the confirmation hearing. The SEC and Secured Note objections have been briefed by counsel, and the issues are ripe for decision.

### Facts

Master Mortgage is a real estate investment fund that filed for Chapter 11 relief on April 17, 1992. *See* 11 U.S.C. § 1101 et seq. At the time of the filing, Saastopankkien Keskus–Osake–Pankki (Skopbank), Master Mortgage's largest creditor, held a claim in excess of $19 million. Skopbank's claim was secured by an assignment of various mortgage backed promissory notes, guarantees and investor promissory notes. Early in the proceedings, Master Mortgage sought Court authorization to use the proceeds from Skopbank's collateral as cash collateral. Master Mortgage also sought a priming lien on Skopbank collateral to stimulate post-petition financing. Needless to say, Skopbank vigorously opposed these actions. Master Mortgage and Skopbank entered a stipulation with regard to the use of cash collateral pending court approval. Prior to the cash collateral hearing, Skopbank and Master Mortgage reached an agreement settling all disputes between the parties, including the cash collateral issue.

Under the terms of the settlement agreement, Skopbank agreed to assign its participation interest in several mortgages. This assignment alone contributed nearly $4 million in value to Master Mortgage. In addition, Skopbank agreed to assign various notes, mortgages, and investor notes. In return, Master Mortgage agreed: (1) to release any and all claims against Skopbank, including all claims in a pending lawsuit between the parties; (2) assign certain loans to Skopbank; and (3) incorporate into the Plan an injunction preventing any creditor or equity security holder from asserting any claim against Skopbank arising from its transactions with Master Mortgage. The injunction would be permanent, continuing in effect beyond Plan confirmation. The Court approved the settlement after notice and a hearing on December 23, 1992.

A number of non-debtor Affiliates also entered settlement agreements with Master Mortgage. Under those agreements, the non-debtor Affiliates released over $3 million in claims against Skopbank, released liens on Master Mortgage property, and agreed to contribute 80% of their payment under postpetition contracts to Master Mortgage who would use the funds to settle a pending lawsuit. The non-debtor Affiliates were to receive a permanent injunction in exchange for their contributions to the reorganization.

Master Mortgage filed it's Fourth Amended Plan of Reorganization on November 18, 1993. The Plan divides the creditors into five classes. Class 1 consists of all allowed secured tax claims. Classes 2A, 2B and 3B contain secured claims which are secured by real property.[2] Class 3A contains claims secured by stock.[3] Class 4 contains all general unsecured claims. Class 5 consists of the claims of equity interest holders. Under the Plan, the general unsecured creditors will be paid in full over twenty years, and the equity interest holders will retain their interest in

---

**1.** The six objectors were: The Securities Exchange Commission, the Federal Deposit Insurance Corporation, the Equity Security Holders Committee, Inter–American Insurance Company, Jacobs Corporation Profit Sharing Plan, and a joint objection by Ronald Aks, James Williams, and Glen Henson.

**2.** Specifically, Class 2A contains BRT Realty Trust, 2B contains the FDIC acting as a receiver for insolvent Metro North State Bank, and Class 3B contains claim holders of Specified Note Fund.

**3.** Class 3A contains claim holders of Secured Note 1 Fund.

Master Mortgage. The Plan incorporates the permanent injunctions as contemplated by the settlement agreements. The Plan impairs all classes except Class 1; however, Class 5 is impaired only by the permanent injunction.

The Plan is to be funded, in part, by a sale of collateral. Master Mortgage held a property interest in the Armendaris Ranch located near Truth or Consequences, New Mexico (the Armendaris Collateral). That interest included a second mortgage encumbering some 380,000 acres, a first mortgage in approximately 2000 acres of lake front property, and a right to immediate foreclosure on both its first and second mortgage interests by virtue of a relief from stay in the Armendaris bankruptcy. Small parcels of the Armendaris Collateral have been sold in the ordinary course of business during Master Mortgage's reorganization. On December 13, 1993, this Court approved a sale of Armendaris Collateral outside the ordinary course. That sale conveyed Master Mortgage's second mortgage interest as well as a portion of its first mortgage interest for $800,000. Master Mortgage retained a deficiency claim in the Armendaris bankruptcy valued at $180,000 and its first mortgage on the lake front property which is expected to yield over $600,000 when that interest is sold in 1996. The $800,000 from the December sale is to be used for Effective Date payments.

At the hearing, Master Mortgage presented the Declaration of Maureen Arnold regarding the final computation of votes dated October 28, 1993. The declaration demonstrated that the procedures set forth in the Disclosure Statement, the Ballots, the Voting Instructions, the Disclosure Order, the Arnold Declaration and all orders of the Bankruptcy Court, with regard to the distribution, receipt, tabulation and computation of the Ballots, the votes to accept or reject the Plan, including temporary estimations and allowances of Claims for voting purposes were properly adopted and followed by Master Mortgage. The procedures were fair, reasonable, adequate and appropriate under the circumstances and complied with all Code requirements.

Four of the five impaired classes of claims voted to accept the Plan and Class 5, consisting of the equity interest holders, impaired solely by virtue of the permanent injunction, voted to accept the Plan. The voting results were as follows:

### *VOTING BY IMPAIRED CLASSES*

| CLASS | NO. OF HOLDERS VOTING | DOLLAR AMOUNT VOTING | % BY NUMBER ACCEPTING | BY AMOUNT ACCEPTING | RESULT |
|---|---|---|---|---|---|
| Class 2A (BRT) | 1 | 5,267,437 | 100% | 100% | Accept |
| Class 2B (FDIC) | 1 | 2,690,253 | | | Reject |
| Class 3A (Secured Note 1 Fund) | 136 | 6,737,379 | 93.4% | 96.2% | Accept |
| Class 3B (Specified Note Fund) | 11 | 628,834 | 100% | 100% | Accept |
| Class 4 (General Unsecured) | 13 | 630,798 | 100% | 100% | Accept |
| | NUMBER OF SHARES VOTED | | | | |
| Class 5 (Shareholders) | 2,423,139 | | 94.8% | | Accept |

The SEC objected to confirmation on the grounds that the permanent injunction in favor of Skopbank and the non-debtor Affiliates violates § 524(e) of the Code; consequently, the Plan does not comply with § 1129(a)(1). Secured Note objected to confirmation arguing that the use of the Armendaris Collateral sale proceeds violates the terms of Plan. For the reasons outlined below, the Court must overrule these objections and confirm the Plan.

### Discussion

Section 1129 enumerates the conjunctive requirements for plan confirmation. The Court may confirm the Plan only if all of the requirements are met. 11 U.S.C. § 1129.

### I. Section 1129(a)(1): The SEC Objection

The SEC has statutory standing to appear and be heard on any issue in a Chapter 11 proceeding. 11 U.S.C. § 1109(a). The SEC objected to the confirmation of the Debtor's Fourth Amended Plan of Reorganization on the grounds that it violates § 1129(a)(1). That section requires a reorganization plan to comply with all applicable provisions of the Code; if it violates any provision of the Code, then a bankruptcy court has no statutory authority to confirm the plan. See 11 U.S.C. § 1129(a)(1). The SEC claims that Master Mortgage's plan, insofar as it provides for a permanent injunction protecting Skopbank and other non-debtor affiliates from creditors and interest holders, runs afoul of § 1129(a)(1) because the injunction violates § 524(e) by impermissibly discharging third parties. The issue is whether a bankruptcy court has the power and authority to issue a permanent injunction or whether § 524(e) prohibits the Court from acting. If the Court concludes that it has the authority to issue such an injunction, then the Court must determine when it is appropriate to issue such an injunction and if it is appropriate in this case.

### A. Section 105 v. 524

■ The SEC contends that § 524(e) removes all authority from the bankruptcy court to issue a permanent injunction, release

non-debtor third parties or otherwise discharge third party liabilities. Skopbank and the non-debtor affiliates argue that § 105 grants the necessary authority to issue an injunction, and § 524(e), on its face, does not restrict a bankruptcy court's power to issue a permanent injunction. Section 105(a) provides in part:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.

Section 524(e) provides:

> Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.

Courts have split on the issue of permanent injunctions and third party releases. Those courts that have allowed injunctions or releases rely on the plain language of § 524 noting that the language:

> does not purport to limit or restrain the power of a bankruptcy court to otherwise grant a release of third parties.

*In re Specialty Equip. Co.*, 3 F.3d 1043, 1047 (7th Cir.1993); *see also, In re A.H. Robins Co.*, 880 F.2d 694, 702 (4th Cir.1989), cert. denied, 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989); *Republic Supply Co. v. Shoaf,* 815 F.2d 1046, 1050 (5th Cir.1987). Section 105 on the other hand is broadly written allowing all orders that are necessary and proper to effectuate a reorganization which may, at times, require the issuance of an injunction or release. *MacArthur Co. v. Johns–Manville Corp.,* 837 F.2d 89, 93 (2d Cir.1988). Thus, while an injunction or release may not be warranted in all cases, a per se rule prohibiting injunctions and releases is "similarly unwarranted, if not a misreading of the statute." *In re Specialty Equip. Co.,* 3 F.3d at 1047.

■ Those courts adopting this permissive view note that injunctions or releases can create some "knotty problems," but have allowed them in specific factual contexts. *See Id.* Factors that courts have considered include:

(1) There is an identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate.[4]

(2) The non-debtor has contributed substantial assets to the reorganization.[5]

(3) The injunction is essential to reorganization. Without the it, there is little likelihood of success.[6]

(4) A substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment.[7]

(5) The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.[8]

No court has set out a rigid "factor test" to be applied in every circumstance. Rather, the courts have engaged in a fact specific review, weighing the equities of each case. The courts seem to have balanced the five listed factors most often. However, these factors do not appear to be an exclusive list of considerations, nor are they a list of conjunctive requirements.

Other courts have reached a contrary result. Those cases advocating a restrictive view of § 524(e) emphasize that § 524(e) discharges the debtor only, not third parties.

4. *In re A.H. Robbins Co.*, 880 F.2d at 701 (indemnity); *MacArthur Co. v. Johns–Manville Corp.*, 837 F.2d at 92 (indemnity); *In re AOV Indus., Inc.*, 792 F.2d 1140, 1142 (D.C.Cir.1986) (indemnity); *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 669 (Bankr.D.D.C.1992) (partner right to reimbursement by partnership); *In re G.S.F. Corp.*, 938 F.2d 1467, 1475 (1st Cir.1991) (indemnity); *In re Kasual Kreation, Inc.*, 54 B.R. 915, 917 (Bankr.S.D.Fla.1985) (suit against officers would result in severe and irreparable harm to the bankruptcy estate); *In re MacDonald Assocs., Inc.*, 54 B.R. 865, 867 (Bankr.D.R.I.1985) (failure to enjoin action against debtor company's two sole shareholders would adversely affect the estate).

5. *In re Specialty Equip. Co.*, 3 F.3d at 1045 (third party creditor extended additional $10 million in credit); *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 288–89 and n. 2 (2d Cir.1992) (creditor and debtor pooled their rights to collect judgments from the debtor's former officers and director into a $1.3 billion dollar fund); *In re A.H. Robbins Co.*, 880 F.2d at 696 (third party insurer contributed assets to a claimant fund); *MacArthur Co. v. Johns–Manville Corp.*, 837 F.2d at 90 (third party insurer contributed $770 million to a claimant fund); *Republic Supply v. Shoaf*, 815 F.2d at 1048 (third party guarantor contributed $850,000 in insurance proceeds to fund the plan); *In re AOV Indus., Inc.*, 792 F.2d at 1142 (creditor released $51 million in claims and contributed an additional $4.5 million); *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. at 665–66 (plan funded exclusively by contributions of non-debtors); *In re Monroe Well Serv., Inc.*, 80 B.R. 324 (Bankr.E.D.Pa.1987) (largest creditor contributed $6.45 million and other creditors paid additional $1.2 million to fund plan).

6. *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d at 289 (no reorganization without principal

creditor settlement, including injunction); *In re A.H. Robbins Co.*, 880 F.2d at 702 (injunction essential to reorganization); *MacArthur Co. v. Johns–Manville Corp.*, 837 F.2d at 90 (injunction the "cornerstone" of the proposed plan); *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. at 667 (injunction the "sine qua non" of the plan); *In re Ionoshpere Clubs, Inc.*, 124 B.R. 635, 642 (S.D.N.Y.1991) (injunction necessary for successful reorganization); *In re Johns–Manville Corp.*, 68 B.R. 618, 625 (Bankr.S.D.N.Y.1986) (no meaningful reorganization unless plan protects the equitable rights of parties in interest); *In re MacDonald Assocs., Inc.*, 54 B.R. at 870 (debtor unable to reorganize without injunction).

7. *In re Specialty Equip. Co.*, 3 F.3d at 1045 (creditors and interest holders entitled to vote "overwhelmingly" accepted the proposed plan treatment); *In re A.H. Robbins Co.*, 880 F.2d at 698 (94% of tort claimants affected by the injunction vote to accept the plan); *In re AOV Indus., Inc.*, 792 F.2d at 1143 (creditor's "overwhelmingly" accepted plan with over 90% of the creditors in each class voting to accept the plan); *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. at 660 (only 1 of 63 creditors and 8 of 93 partners objected to injunction); *In re Johns–Manville Corp.*, 68 B.R. at 621 (plan overwhelmingly accepted).

8. *In re Specialty Equip. Co.*, 3 F.3d at 1044–45 (plan provided for payment in full of priority and general unsecured claims); *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d at 288 (impaired parties received a pro rata share in fund established to satisfy their claims and estimated by the court to satisfy them in full); *In re A.H. Robbins Co.*, 880 F.2d at 697 (plan create claimant fund estimated to pay in full all tort claimants affected by injunction); *In re Johns–Manville Corp.*, 68 B.R. at 621 (plan create a trust out of which claims were to be paid).

See, e.g., *In re Western Real Estate Fund, Inc.*, 922 F.2d 592, 601 (10th Cir.1990), as amended, *Abel v. West*, 932 F.2d 898 (10th Cir.1991); *In re American Hardwoods, Inc.*, 885 F.2d 621, 625 (9th Cir.1989). The current § 524(e) is a reenactment of § 16 of the Bankruptcy Act of 1989 which more specifically provided that:

> The liability of a person who is a co-debtor with, or guarantor or in any manner a surety for, a bankrupt shall not be altered by the discharge of such bankrupt.

Act of July 1, 1898, ch. 541, § 16, 30 Stat. 550 (formerly codified at 11 U.S.C. § 34 (1976)). *See Underhill v. Royal*, 769 F.2d 1426, 1432 (9th Cir.1985). Relying on Act precedent, the courts conclude that any effort to release or protect a non-debtor third party contravenes the mandates of the Code. *See, e.g., Union Carbide Corp. v. Newbowles*, 686 F.2d 593, 595 (7th Cir.1982).

The Court has found no Eighth Circuit opinion on point, but has found one bankruptcy case from the Western District relevant here. *See In re Burstein–Applebee Co.*, 63 B.R. 1011 (Bankr.W.D.1986). In that case, Judge Stewart permanently enjoined a debtor's principals from pursuing state court action against members of the creditor's committee, a non-debtor. *Id.* at 1020–21.

The Court finds the permissive view more persuasive, and concludes that the Court has the authority to issue a permanent injunction or third-party release. The Court does so for three reasons: (1) the plain language of the statute supports this position, (2) an important case relied upon by the restrictive view courts has been overturned, and (3) the factors important to the permissive view courts were not present in restrictive view cases.

■ First, the clear pattern that has emerged from recent Supreme Court rulings is that an analysis of the plain meaning of the statute is to be used in construing the Bankruptcy Code. *See, e.g., Pioneer Inv. Serv. Co. v. Brunswick Assocs. Ltd. Partnership*, —— U.S. ——, ——–——, 113 S.Ct. 1489, 1494–95, 123 L.Ed.2d 74 (1993); *Rake v. Wade*, —— U.S. ——, ——, 113 S.Ct. 2187, 2191, 124 L.Ed.2d 424 (1993); *Patterson v. Shumate*, —— U.S. ——, ——, 112 S.Ct.

2242, 2246, 119 L.Ed.2d 519 (1992); *Toibb v. Radloff*, 501 U.S. 157, 159–61, 111 S.Ct. 2197, 2199, 115 L.Ed.2d 145 (1991); *United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 240–42, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989); *see also Dewsnup v. Timm*, —— U.S. ——, ——, 112 S.Ct. 773, 778, 116 L.Ed.2d 903 (1992) (J. Scalia dissenting). When the plain language is clear, the court need go no further in its inquiry. *United States v. Ron Pair Enter. Inc.*, 489 U.S. at 240–42, 109 S.Ct. at 1030. Moreover, the court should interpret the Code in a manner that avoids conflict. *Id.* 489 U.S. at 245–47, 109 S.Ct. at 1033.

To the extent that § 524(e) does not explicitly prohibit the court from issuing a permanent injunction, the language is clear, and the Court need not look to the statutory precursor of § 524 as did the courts in *In re Western Real Estate Fund, Inc.*, 922 F.2d 592, and *In re American Hardwoods, Inc.*, 885 F.2d 621. To interpret the section as prohibiting all permanent injunctions would create a conflict with § 105 where there need be none.

Second, the courts using § 524(e) to limit § 105 relied on the Seventh Circuit's *Union Carbide Corp. v. Newbowles*, 686 F.2d 593 (1982), decision for the proposition that § 524 can never alter the rights of third party non-debtors. *See, e.g., In re Western Real Estate Fund, Inc.*, 922 F.2d at 601; *In re American Hardwoods, Inc.*, 885 F.2d at 625–26; *Underhill v. Royal*, 769 F.2d at 1432. The *Union Carbide* rule has been substantially revised by the Seventh Circuit in *In re Specialty Equip. Co.*, 3 F.3d at 1046. The Seventh Circuit explained that *Union Carbide* stands *only* for the proposition that a gratuitous release of a third party who did not contribute to a reorganization plan was invalid. *Id.* A third party release where the creditors "overwhelmingly" accept the plan and the party to be released pledges additional credit to the reorganized debtor is valid. *Id.* Thus, the seminal ruling prohibiting permanent injunctions and releases has been revised.

Third, the five factors considered important to permissive view courts were not pres-

ent in the restrictive view cases. For example in *In re Western Real Estate,* the Tenth Circuit refused to endorse a plan that proposed to enjoin a single attorney from the collection of his contingency fee against a third party. *See* 922 F.2d at 595. The third party protected by the injunction did not provide new and substantial contributions to the reorganized debtor, the injunction was not essential to the reorganization, and the only affected creditor, the attorney, did not agree to the plan's treatment of his claim and the concomitant injunction. *Id.* at 594–595. Similarly in *In re American Hardwoods,* the Ninth Circuit invalidated a plan that proposed to insulate non-debtor guarantors of a secured debt by use of a permanent injunction. 885 F.2d at 622. The non-debtor guarantors "did not offer to contribute assets to [the] bankruptcy estate," the injunction was not alleged to be essential to the reorganization, and the sole affected creditor did not acquiesce to its treatment. *See Id.*

■ The Court believes that under appropriate, limited circumstances a bankruptcy court has the power to issue a permanent injunction or third party release. Consequently, the Court adopts the permissive view as espoused in the 2nd, 4th, 5th, 7th and D.C. Circuits. While recognizing a bankruptcy court's power to issue the injunction or release, the Court agrees with the 7th Circuit that a permanent injunction can pose some "knotty" problems. *See In re Specialty Equip. Co.,* 3 F.3d at 1047. Because of these problems, the Court believes that the exercise of that power is discretionary. The Court cautions the Gentle Reader that a permanent injunction is a rare thing, indeed, and only upon a showing of exceptional circumstances in which the factors outlined above are present will this Court even entertain the possibility of a permanent injunction.

### B. Application to Skopbank and Non-debtor Affiliates

■ The Court now turns to the facts at hand. The first factor to be considered is whether there is an identity of interest between Master Mortgage and the entities to be protected by the injunction. The settlement agreement between Skopbank and Master Mortgage creates a right of indemnity between the parties. Thus, any post-petition action against Skopbank would result in a right of contribution against Master Mortgage. Such action would seriously affect Master Mortgage's ability to successfully reorganize. However, the indemnity relationship did not exist prior to the bankruptcy, rather it was negotiated in conjunction with the permanent injunction. Thus, this factor weighs in favor of an injunction benefitting Skopbank, but only marginally because the injunction and indemnity provisions arose contemporaneously.

The non-debtor Affiliates have a right of indemnification against Master Mortgage pursuant to pre-petition contracts. This indemnity relationship extends to all of the possible lawsuits proposed to be enjoined by the permanent injunction. Factor one weighs in favor of an injunction favoring the non-debtor Affiliates.

The second factor to be considered is whether the non-debtor has contributed substantial assets to the reorganization. The Skopbank settlement compromised and settled all of Skopbank's claims against the estate. Under that agreement, Skopbank assigned participation interests and released its collateral interest in various notes and mortgages. These contributions have permitted, for example, a distribution to Class 3A, the holders of interest in Secured Note, who will receive an interest in the liquidation of some 2000 acres of lake front property from the Armendaris Collateral. This collateral was previously part of Skopbank's collateral package. In effect, the contributions of Skopbank valued at more than $4 million dollars have allowed for a distribution to other creditors. This is a substantial contribution of assets, and factor two weighs in Skopbank's favor.

The non-debtor Affiliates have also contributed substantial assets. They have released $3 million in claims against Skopbank, and such release allowed Master Mortgage to settle with Skopbank. Moreover, the non-debtor Affiliates are to contribute 80% of their payment under post-petition contracts to the reorganization. Factor two weighs in

favor of an injunction for the non-debtor Affiliates.

Factor three considers whether the injunction is essential to the reorganization. There is little debate among the creditors that without the Skopbank settlement, Master Mortgage could not have reorganized. Skopbank was the single largest creditor, holding more than $19 million in claims. Without the settlement, little could be offered to satisfy other creditor's claims. The assets contributed by Skopbank form the foundation of the Plan. Just as the settlement is the linchpin of the Plan, the injunction is the cornerstone of the settlement. Without the settlement, Skopbank would not have been willing to settle. Thus, the Skopbank settlement and the injunction were essential to the reorganization. Factor three weighs in Skopbank's favor.

The non-debtor Affiliates released over $3 million in claims against Skopbank to facilitate the settlement. As mentioned before, without a release of claims and an injunction Skopbank would not have been willing to settle. Thus, the non-debtor Affiliates' release was also essential to the settlement. Factor three favors their injunction as well.

Factor four considers creditor approval of the injunction. The Court considers this the single most important factor. As shown by the table above, the creditors have overwhelmingly voted to approve the plan. Specifically, Class 5 which is impaired only by virtue of the injunction voted 94.8% in favor of the plan. The members of Class 3A, interest holders in Secured Note, voted 93.4% in number and 96.2% in amount in favor of the plan. Thus, the classes most affected by the permanent injunction have overwhelmingly accepted the proposed Plan treatment. Additionally, the Court notes that the only rejecting class, Class 2B containing the FDIC, settled its claims with Master Mortgage and no longer opposes the Plan. Thus, factor four weighs heavily in favor of the injunction.

Finally, factor five considers whether the Plan provides for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction. The Plan proposes to pay in full all members of Class 3A under two alternative treatments. The first alternative would provide claimants 6% debentures to be paid periodically from specific sources, and to be paid in full by 2003. The second alternative would assign loan participation interests in the full amount of the claim with interest. Class 4, the general unsecured creditors, also are to receive full payment with interest over time. Class 5, the equity interest holders impaired solely by the injunction, will retain the full amount of their equity interest in the reorganized company. Therefore, the Plan proposes to pay in full all of the claims impaired by the injunction. Factor five weighs in favor of the injunction.

All five factors weigh towards the issuance of a permanent injunction in this case. Most significantly the injunction enjoys the support of virtually all creditors. Section 524(e) does not prohibit the issuance of a permanent injunction. That power is within the sound discretion of the Court, and after a close examination of the facts in this case, the Court has concluded that the issuance of a permanent injunction is appropriate here.[9] Therefore, the SEC objection to confirmation must be OVERRULED. Thus, the Plan complies with all applicable provisions of the Code in accordance to § 1129(a)(1).

## II. Section 1129(a)(2)–(10)

As set forth herein, Master Mortgage, as the proponent of the Plan, has complied with the applicable provisions of the Code, including the disclosure requirements of § 1125, satisfying 11 U.S.C. § 1129(a)(2).

Master Mortgage's objectives in filing its chapter 11 petition and in proposing and confirming the Plan were and are to preserve and protect its business through reorganization, and maximize the value of money and

---

**9.** The Court specifically notes that the permanent injunction has no effect upon a governmental unit's action to enforce such governmental unit's police or regulatory power. *See* 11 U.S.C. § 362(b)(4). The injunction should not be construed or interpreted to impair or preclude the continued prosecution by the United States Dept. of Labor of the civil action entitled *Reich v. Bennett,* No. 93–2522KHV (D.Kan.) for alleged ERISA violations.

property available for distribution to its creditors. Thus, the Plan was proposed in good faith and not by any means forbidden by law within the meaning of 11 U.S.C. § 1129(a)(3).

Any payment made or to be made by Master Mortgage, as the proponent of the Plan, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Reorganization Case or in connection with the Plan and incident to the Reorganization Case, has been approved by, or is subject to the approval of, the Court as reasonable. Therefore, the Plan complies with 11 U.S.C. § 1129(a)(4).

Master Mortgage, as the proponent of the Plan, has disclosed the identity and affiliation of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of Master Mortgage, or the Reorganized Fund and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy in accordance with 11 U.S.C. § 1129(a)(5)(A). Master Mortgage, as the proponent of the Plan, has also complied with 11 U.S.C. § 1129(a)(5)(B) by disclosing the identity of any insider that will be employed or retained by the Reorganized Debtor and the nature of any compensation for such insider.

The Plan does not provide for any rate changes that are subject to the jurisdiction of any governmental regulatory commission after confirmation of the Plan. Consequently, 11 U.S.C. § 1129(a)(6) is inapplicable.

The Plan designates Classes 2A, 2B, 3A, 3B and 4 as impaired under the Plan. Class 5 is impaired solely with regard to the permanent injunction. All of these impaired classes, except class 2B voted to accept the Plan, and with regard to Class 2B, the class will receive or retain under the Plan on account of such Allowed Claim property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain under a hypothetical chapter 7 liquidation. *See* 11 U.S.C. § 1129(a)(7)(A). No creditor made a § 1111(b)(2) election prior to the confirmation of the Disclosure Statement on November 4, 1993. *See* 11 U.S.C. § 1129(a)(7)(B). Thus, the Plan complies with § 1129(a)(7).

With respect to § 1129(a)(8), all classes are not unimpaired, nor have all impaired classes accepted the Plan. Class 1 is unimpaired, and impaired Classes 2A, 3A, 3B, 4, and 5 accepted the Plan. However, Class 2B rejected the Plan. Therefore, § 1129(a)(8) has not been satisfied. As a result, the Plan must be crammed down under § 1129(b).[10]

Section 2.2 of the Plan provides that, with respect to an Allowed Claim of a kind specified in § 507(a)(1), the holder of such Allowed Claim will receive on the Effective Date on account of such Allowed Claim cash equal to the allowed amount of such Allowed Claim, except to the extent the holder of such Allowed Claim has agreed to a different treatment. *See* 11 U.S.C. § 1129(a)(9)(A). There are no Claims of a kind specified in § 507(a)(2) of the Code in the Reorganization Case. *Id.* Nor are there Allowed Claims of a kind specified in § 507(a)(3), 507(a)(4), 507(a)(5) or 507(a)(6); thus, § 1129(a)(9)(B) is inapplicable.

Section 2.2 of the Plan provides that with respect to an Allowed Claim of a kind specified in § 507(a)(7) of the Bankruptcy Code, the holder of such Allowed Claim will receive on account of such Allowed Claim either cash on the Effective Date of the Plan equal to the allowed amount of such Allowed Claim or deferred cash payments, over a period not exceeding six years after the date of assessment of such Allowed Claim, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Allowed Claim, except to the extent the holder of such Allowed Claim has agreed to a different treatment. *See* 11 U.S.C. § 1129(a)(9)(C). Consequently, all applicable requirements under § 1129(a)(9) have been met.

---

10. The FDIC settled its claims with Master Mortgage and withdrew its objection to plan confirmation. This change of heart creates near unanimity among the creditors in favor of the plan. Although the FDIC no longer opposes the plan, it has yet to make a motion to change its vote to reject to one accepting the plan pursuant to Fed.R.Bankr.P. 3018. Procedurally, the plan must be crammed down on the FDIC, albeit with the FDIC's consent.

At least one Class of Allowed Claims that is impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any insider. In fact, all but one impaired class accepted the Plan. Therefore, § 1129(a)(10) has been satisfied.

### III. Section 1129(a)(11): The Secured Note Objection

Based on testimony presented at the confirmation hearing, the Court allowed Secured Note fourteen days in which to file a written objection to confirmation which Secured Note timely filed. Secured Note objected to confirmation on the grounds that the proceeds from the Armendaris Collateral are to be used for effective date payments in violation of the Plan which requires the payment of Armendaris Collateral proceeds to the Secured Note debentures. While Master Mortgage characterized this argument as an "anticipatory breach of plan" argument, the Court will treat the objection as a feasibility argument under § 1129(a)(11).

Plan § 4.5 provides that on the Effective Date of the Plan The interest holders in Secured Note will receive 6% convertible debentures. The debentures will be paid semi-annually with a twenty year amortization. The Plan proposes a $200,000 payment up front on the debentures. Moreover, the Plan provides:

> [i]n addition to the semiannual payments under the debentures, the Reorganized Debtor shall make a principal payment on the debentures in the amount of fifty percent (50%) of any proceeds received by the Debtor from the Armendaris Collateral. Any additional payments shall be made within 30 days of receipt of the proceeds by the Reorganized Debtor.

Secured Note argued that this language requires Master Mortgage to pay on the effective date of the Plan $600,000 to the proposed debentureholders. Secured Note arrived at this figure by adding the $200,000 committed under the plan with 50% of the $800,000 realized from the sale of Armendaris Collateral which the court approved in December, 1993. To the extent that Master Mortgage has committed the $800,000 for effective date payments, argued Secured Note, Master

Mortgage will not comply with the Plan. By implication, if Master Mortgage cannot use the $800,000 for effective date payments the Plan is not feasible under § 1129(a)(11). Further, Secured Note argued that if the Armendaris Collateral proceeds are not paid on the Effective Date to the debentureholders, then no payment will be made because the collateral source will have been depleted.

The Court does not agree. Secured Note has overlooked the multiplicity of interests that Master Mortgage has in the Armedaris Collateral. Master Mortgage held a second mortgage on some 380,000 acres, a first mortgage on some 2000 acres of lake front property, a right of immediate foreclosure, and a deficiency claim in the Armendaris bankruptcy. While Master Mortgage has sold some parcels of the collateral in the ordinary course of business and the Court has approved an sale outside the ordinary course, Master Mortgage still retains its first mortgage on the lake front property, and its right to immediate foreclosure. This Court heard unrebutted evidence that the value Master Mortgage's interest in the lake front property exceeded $600,000 based on a proposed sale in 1996. In addition, Master Mortgage holds a $180,000 deficiency claim in the Armendaris Bankruptcy. On Table 5 of the Disclosure Statement, Master Mortgage estimates that $600,000 will be realized from the sale of the Armendaris Collateral by 1996. The lake front property is earmarked by the Disclosure Statement to fund § 4.5 of the Plan. Master Mortgage still retains that interest and will be able to make its 50% distribution in 1996. Therefore, Plan § 4.5 is feasible according to the terms of the Plan and Disclosure Statement, and Secured Note's objection must be OVERRULED.

Master Mortgage prepared financial projections for the Reorganized Fund and established that those projections are attainable and reasonable and evidence the Reorganized Fund's ability to operate after the Effective Date and to meet its obligations under the Plan. Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Fund, unless such liquidation or reorganization is proposed in or

contemplated by the Plan. The financing arrangements, made by Master Mortgage, are sufficient in the aggregate to satisfy all of the financial obligations under the Plan that are due or must be funded as of the Effective Date. Thus, the Plan complies with 11 U.S.C. § 1129(a)(11).

### IV. Section 1129(a)(12)–(13)

All fees payable under 28 U.S.C. § 1930 have been paid or will be paid on the Effective Date of the Plan in compliance with § 1129(a)(12).

There are no retiree benefits, as that term is defined in § 1114 of the Code, in this case. Therefore, the provisions of § 1129(a)(13) are not applicable to the Plan.

### V. Section 1129(b): Cram Down [11]

All applicable requirements for plan confirmation in § 1129(a) have been met other than those found in subsection (a)(8). Therefore the only route to plan confirmation is cram down under § 1129(b). The Court must determine if the Plan is fair and equitable to Class 2B which contains the FDIC's secured claim. The FDIC acknowledged at the hearing and the Court so finds that the Plan does not discriminate unfairly and is fair and equitable because (i) the holder of the claim in Class 2B is retaining liens to secure such claims on property whose value exceeds the allowed amount of such claim and (ii) such holder will receive deferred cash payments, totalling at least the allowed amount of such claim, of a value as of the Effective Date of at least the value of the holder's interest in the estate's interest in such property. *See* 11 U.S.C. § 1129(b)(2)(A)(i). Thus, the Plan meets the cram down requirements, and may be confirmed.

### VI. Conclusion

Based on the discussion above, the objections by the SEC and Secured Note are hereby OVERRULED. The Court concludes that Master Mortgage's Plan complies with § 1129 and is hereby CONFIRMED. A separate order will be entered.

The foregoing Memorandum Opinion Constitutes Findings of Fact and Conclusions of Law as required by Fed.R.Bankr.P. 7052. Notwithstanding Federal Rule of Bankruptcy Procedure 7062, the Confirmation Order and these Findings of Fact and Conclusions of Law shall be effective and enforceable immediately upon entry, unless otherwise ordered by the Court.

However, there has been no Rule 3018 motion to change the FDIC's vote, and the Court must consider cram down.

11. As noted above in note 10, the FDIC, the only rejecting class, settled its claims with Master Mortgage, and it no longer opposes the plan.